**2026 WI 29**

# Supreme Court of Wisconsin



CHARLIE MAY BREKKE,
*Plaintiff-Appellant*,

*v.*

MIDWEST MEDICAL INSURANCE CO., et al.,
*Defendants-Respondents*.

No. 2023AP498
Decided July 10, 2026

APPEAL from a judgment and order of the Winnebago County
Circuit Court (Woldt, Scott C., J.) No. 2017CV360

Jill J. Karofsky, C.J., delivered the majority opinion of the Court, in which Rebecca Frank Dallet, Janet C. Protasiewicz, and Susan M. Crawford, JJ., joined. Brian K. Hagedorn, J., filed a concurring opinion. Susan M. Crawford, J., filed a concurring opinion in which Jill J. Karofsky, C.J., joined. Annette Kingsland Ziegler, J., filed an opinion concurring in part and dissenting in part. Rebecca Grassl Bradley, J., filed an opinion concurring in part and dissenting in part.

¶1      JILL J. KAROFSKY, C.J. The court of appeals certified to us the following question: Whether an unborn child (or any minor child) is a

patient under WIS. STAT. § 448.30 (2013–14)[1] and thus entitled to informed consent with the independent right to pursue legal action against a physician who fails to comply with said statute.

¶2    We hold that Charlie May Brekke was a patient under § 448.30 before her birth. The physician who treated Charlie and her surrogate birth mother, Samantha,[2] during the pregnancy and birth had a duty to obtain informed consent from Samantha regarding herself and Charlie. As Charlie was born alive, we determine she had an independent right to pursue an informed consent claim. Therefore, we reverse the circuit court's decision granting partial summary judgment to the defendants and remand the case to the circuit court for further proceedings on Charlie's informed consent claim.

## I.  BACKGROUND

¶3    To provide context, we begin with the allegations underlying Charlie's claims in this lawsuit. Then we recount the defendants' arguments in support of their motion for partial summary judgment, the circuit court's resolution of that motion, and the negligence claim that proceeded to trial. We then detail the parties' arguments on appeal, and the narrow question the court of appeals asked this court to resolve.

### A.  CHARLIE'S COMPLAINT

¶4    In November of 2015 Charlie May Brekke was born via a surrogate, Samantha. Charlie was injured during the birthing process and consequently filed a lawsuit in 2017 through a guardian ad litem along with her parents, Timothy Brekke and Chad Brekke.[3] Charlie sued Dr. Craig M. Batley, the physician who delivered Charlie and provided

---

[1] All references to the Wisconsin Statutes are to the 2013–14 version unless specified otherwise.

[2] To protect her privacy, we refer to the birth mother using the same pseudonym as the court of appeals.

[3] United Healthcare Services, Inc. was also an involuntary plaintiff. Timothy's and Chad's claims were dismissed with prejudice by stipulation.

Samantha with prenatal care, as well as Dr. Batley's insurer Midwest Medical Insurance Co.[4]

¶5 Prior to delivery, Samantha was diagnosed with gestational diabetes, which carries a risk of birthing macrosomic—or particularly large—babies. Indeed, Charlie weighed eleven pounds and five ounces at her birth. During Charlie's birth, which occurred via a vaginal delivery, complications arose due to her large size. Specifically, Charlie alleges she suffered from shoulder dystocia which in turn caused her to suffer a brachial plexus injury, which has left her permanently limited and disfigured.[5]

¶6 Charlie filed two claims against Dr. Batley: (1) a claim for negligence for his handling of Samantha's pregnancy and delivery, and (2) a claim for failure to obtain informed consent under § 448.30 and Wisconsin common law. As to the second claim, she alleged that Dr. Batley breached his duty to disclose to Samantha and the Brekkes alternative modes of treatment and the risks and benefits of those treatments. This included failing to disclose the risk of shoulder dystocia and a permanent brachial plexus injury and failing to offer a cesarean section as an alternate mode of delivery.

¶7 As to both claims, Charlie alleges that Dr. Batley's negligence and his failure to comply with § 448.30 proximately caused severe and permanent injury. Charlie seeks damages for that injury, as well as for her pain and suffering.[6]

---

[4] Charlie additionally named Thedacare Physicians—Eastridge, Thedacare Medical Center—Berlin, Inc., and the Injured Patients and Families Compensation Fund. The Thedacare defendants and the Injured Patients and Families Compensation Fund were dismissed with prejudice by stipulation. This case will refer to the remaining defendants collectively as "Dr. Batley."

[5] Shoulder dystocia is a serious condition that occurs when a baby's head delivers but a shoulder becomes lodged behind the maternal pubic bone.

[6] The Brekkes also alleged that they suffered damages, but those allegations are not relevant to the issues before us.

### B.  THE CIRCUIT COURT RESOLUTION

¶8      Dr. Batley filed a motion for partial summary judgment as to the informed consent claim on one ground: under § 448.30, Dr. Batley owed a duty of informed consent only to Samantha, no one else, including Charlie. Dr. Batley argued that the informed consent claim failed as a matter of law because Samantha was the only person who received medical services during the labor, but she was not a plaintiff in the lawsuit. Dr. Batley highlighted how the terms of the surrogacy agreement provided that Samantha controlled all medical decisions about the pregnancy and birth until after Charlie's birth.

¶9      Charlie responded that she has the right to bring an informed consent claim on her own behalf for treatment Dr. Batley provided to her during the pregnancy and birth.[7] Charlie relied on § 448.30 and public policy grounds and argued that Dr. Batley owed Samantha and her separate duties to obtain informed consent. And if Dr. Batley breached his duty to disclose, Charlie reasoned, the inquiry would then be whether a "reasonable person in Charlie's position, had they been capable of giving consent," would have opted to be delivered by cesarean section. In reply, Dr. Batley took issue with Charlie's "reasonable patient" argument.

¶10     After a hearing, the circuit court dismissed Charlie's informed consent claim. The court reasoned that Samantha was Dr. Batley's patient and that "[t]he informed consent would need to be given to the mother and no one else and that the claim would have to be brought through the mother . . . ."

---

[7] Charlie also argued that Timothy Brekke, her biological father, had the right to receive information and provide consent relating to Charlie's care prior to birth. Dr. Batley responded that Timothy was never Dr. Batley's patient. On appeal, Charlie abandoned the argument that Dr. Batley owed any duty to Timothy Brekke (either on his own behalf or on Charlie's behalf) and has focused only on the argument that Dr. Batley owed Samantha a duty under WIS. STAT. § 448.30 on Charlie's behalf.

¶11    Charlie's negligence claim proceeded to a jury trial.[8] Charlie introduced evidence to support her claim that Dr. Batley was negligent in delivering Charlie and in responding to the presentation of shoulder dystocia which caused Charlie's injury and damages. Dr. Batley offered expert testimony to prove that he was not negligent and that Charlie's injury occurred in the birth canal prior to the presentation of shoulder dystocia. The special verdict form included three questions:

1) Was Dr. Batley negligent in the delivery of Charlie Brekke?
2) Was Dr. Batley's negligence a cause of Charlie Brekke's brachial plexus injury?
3) What sum of money, will fairly and reasonably compensate Charlie Brekke for Past and Future Pain, Suffering, Disfigurement and Disability?[9]

The jury determined that Dr. Batley was not negligent, and it entered a slashed zero in response to the damages question. Charlie made no post-verdict motions with respect to damages.

## C.  APPEAL AND COURT OF APPEALS CERTIFICATION

¶12    Charlie appealed the circuit court's decision dismissing the informed consent claim on summary judgment. Charlie contended that Dr. Batley owed her a duty of informed consent under § 448.30 prior to her birth. Charlie further maintained that she could prove causation by showing that had she been properly informed, a "reasonable baby" in her position would have chosen to be delivered by cesarian section and consequently would have avoided her injuries. According to Charlie, although Samantha was the one to make that decision as the birth mother, the causation inquiry must consider only Charlie's best interests.

¶13    Dr. Batley countered that § 448.30 does not create an independent right of recovery for Charlie and that the common law

---

[8] Charlie sought leave to appeal the circuit court's partial summary judgment order, which the court of appeals denied.

[9] The jury was instructed to answer the third question regardless of how it answered the first two questions. Charlie did not object to any of these questions.

recognizes no such right for an unborn child. Dr. Batley also asked the court of appeals to affirm the circuit court because he was entitled to summary judgment based on the facts and because Charlie could not re-litigate her claim for damages.

¶14    The court of appeals did not resolve these issues and instead certified the following question for our review: Whether an unborn child (or any minor child) is a patient under WIS. STAT. § 448.30 and thus entitled to informed consent with the independent right to pursue legal action against a physician who fails to comply with said statute. *Brekke v. Midwest Med. Ins. Co.*, No. 2023AP498, unpublished slip. op. ¶2 (Wis. Ct. App. Apr. 9, 2025). We granted certification and take jurisdiction over all issues in the case. WIS. STAT. § 808.05(2).[10]

## II.  STANDARD OF REVIEW

¶15    We review the circuit court's grant of partial summary judgment de novo, applying the same methodology as the circuit court. *DSG Evergreen Fam. Ltd. v. Town of Perry*, 2020 WI 23, ¶15, 390 Wis. 2d 533, 939 N.W.2d 564. Summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2). The interpretation of WIS. STAT. § 448.30, presents a question of law which we review de novo. *Bubb v. Brusky*, 2009 WI 91, ¶32, 321 Wis. 2d 1, 768 N.W.2d 903.

---

[10] Various separate writings insist that we are coloring outside the lines by deciding issues beyond the certified question presented. So, some procedural clarification is in order. When we answer a certified question from another jurisdiction, we answer only the specific question presented and return the case to the original jurisdiction. WIS. STAT. ch. 821. When we grant a petition for review, we often limit our review to specific questions or issues of law. WIS. STAT. § 809.62(6). However, when we accept certification from the court of appeals, as we did here, such a certification operates as a bypass under WIS. STAT. § 808.05. As such, we take jurisdiction over the entire appeal and may resolve all issues raised. We are not limited to answering the question as certified by the court of appeals. Indeed, it is our responsibility to address all relevant arguments made by the parties on appeal.

## III.  ANALYSIS

¶16    We begin with a brief history of the evolution of informed consent claims in Wisconsin. Then we examine WIS. STAT. § 448.30 and all relevant intrinsic sources. We hold that Charlie was a patient under the statute and that § 448.30(2) and (6) do not categorically relieve a physician of the duty to obtain informed consent before treating an unborn child. We next analyze whether Charlie's claim is derivative of Samantha's informed consent claim and determine it is not. We then examine whether finding in Charlie's favor will lead to conflicts between pregnant patients and their unborn children and determine it will not. We conclude by rejecting Dr. Batley's remaining arguments.

A.  WISCONSIN'S HISTORY OF INFORMED CONSENT AND Wis. Stat. § 448.30.

¶17    "The doctrine of informed consent comes from the common law and stems from the fundamental notion of the right to bodily integrity[.]" *Martin v. Richards*, 192 Wis. 2d 156, 169, 531 N.W.2d 70 (1995). In the past, when a medical professional failed to obtain informed consent, a patient would file a claim for tortious battery or assault and battery. *See Throne v. Wandell*, 176 Wis. 97, 101, 186 N.W. 146 (1922) ("An operation without the consent of a patient" who is capable of consultation "constitutes a technical assault." (citations omitted)). Such a claim was extended to a patient who was not adequately advised of the potential ramifications of treatment before giving consent because a lack of relevant information vitiated the consent. *See Trogun v. Fruchtman*, 58 Wis. 2d 569, 597–98, 207 N.W.2d 297 (1973) (explaining the development of theories of informed consent). In the 1970s Wisconsin shifted away from a battery theory of recovery to one of negligence. *Id.* at 598–600 ("[I]t is preferable to affirmatively recognize a legal duty, bottomed upon a negligence theory of liability, in cases wherein it is alleged the patient-plaintiff was not informed adequately of the ramifications of a course of treatment.").

¶18    In *Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis. 2d 1, 227 N.W.2d 647 (1975), this court clarified the limits of a negligence-based informed consent case. There, we stated that "the doctor is to make such disclosures as appear reasonably necessary under circumstances then existing to enable a reasonable person under the same or similar circumstances confronting the patient at the time of disclosure to intelligently exercise his right to consent or to refuse the treatment or procedure proposed." *Id.* at 13. We also discussed reasonable limitations on a doctor's duty to disclose and determined that a doctor need not

discuss: (1) detailed medical explanations that a patient is unlikely to understand, (2) risks apparent to a patient, or (3) extremely remote possibilities that serve to falsely or detrimentally alarm a patient. *Id.* at 12–13. Also, a doctor's duty is limited in cases of emergency, if the patient is mentally incompetent, or if the patient is a child. *Id.* And "[c]onsent in case the patient is a child is probably the obligation of the parent or guardian." *Id.* at 13, n.3. Finally, we clarified that on the question of causation, an objective standard is applied, which asks what a reasonable person in the patient's position would have decided if adequately informed of all relevant information. *Id.* at 13–14.

¶19    In 1981, the Wisconsin legislature passed WIS. STAT. § 448.30, codifying a physician's duty to inform a patient about treatment. Chapter 375, Laws of 1981. In the following years, cases interpreting § 448.30 treated that statute as a codification of the common law standard articulated in *Scaria*. *See Schreiber v. Physicians Ins. Co. of Wis.*, 223 Wis. 2d 417, 427, 588 N.W.2d 26 (1999); *Martin*, 192 Wis. 2d at 174. In 2013, the legislature revised § 448.30 to incorporate a "reasonable physician" standard. 2013 Wis. Act 111. Section 448.30, presently and at the time of Charlie's birth, reads:

> **448.30 Informed Consent.** Any physician who treats a patient shall inform the patient about the availability of reasonable alternate medical modes of treatment and about the benefits and risks of these treatments. The reasonable physician standard is the standard for informing a patient under this section. The reasonable physician standard requires disclosure only of information that a reasonable physician in the same or a similar medical specialty would know and disclose under the circumstances. The physician's duty to inform the patient under this section does not require disclosure of:
>
> **(2)** Detailed technical information that in all probability a patient would not understand.
>
> **(3)** Risks apparent or known to the patient.
>
> **(4)** Extremely remote possibilities that might falsely or detrimentally alarm the patient.

**(5)** Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.

**(6)** Information in cases where the patient is incapable of consenting.

**(7)** Information about alternate medical modes of treatment for any condition the physician has not included in his or her diagnosis at the time the physician informs the patient.

B.  CHARLIE MAY BREKKE WAS A PATIENT UNDER Wis. Stat. § 448.30.

¶20    Our task is to determine whether an unborn child in Charlie's position is a "patient" under WIS. STAT. § 448.30. "[S]tatutory interpretation begins and is usually complete only after a full consideration of all relevant intrinsic sources" including "the statutory text at issue, related statutes and phrases, a statute's place within the statutory structure, its stated or textually manifest purpose, and statutory history." *Serv. Emp. Int'l Union Healthcare Wis. v. WERC*, 2025 WI 29, ¶¶8, 10, 416 Wis. 2d 688, 22 N.W.3d 876. Statutory language is to be interpreted "reasonably, to avoid absurd or unreasonable results." *Myers v. DNR*, 2019 WI 5, ¶30, 385 Wis. 2d 176, 922 N.W.2d 47 (citations omitted).

¶21    As an initial matter, § 448.30 does not define "patient." Other Wisconsin statutes related to healthcare or healthcare records define "patient" as "a person who receives health care services from a health care provider." WIS. STAT. §§ 146.81(3), 153.01(7). This meaning is consistent with the common understanding of the term as well as the dictionary definition. *Patient*, The American Heritage Dictionary of the English Language (3d ed. 1992) ("One who receives medical attention, care, or treatment.").

¶22    Charlie argues that "[t]here can be no serious dispute that Charlie was Dr. Batley's patient directly before her birth." She points to two Wisconsin decisions that recognize an unborn child during the birthing process as a "patient": (1) *Pierce v. Physician's Ins. Co. of Wis., Inc.*, 2005 WI 14, ¶28, 278 Wis. 2d 82, 692 N.W.2d 558, in which this court recognized that "there are two patients" in the context of a mother pursuing a claim for negligent infliction of emotional distress stemming from the stillbirth of her daughter; and (2) *Preston v. Meriter Hosp., Inc.*, 2008 WI App 25, 307 Wis. 2d 704, 747 N.W.2d 173, in which the court of

appeals applied the Emergency Medical Treatment and Labor Act to an unborn child during labor as an "inpatient."

¶23    In response, Dr. Batley hedges his arguments. On one hand, he concedes that prior to Charlie's birth he had ethical and professional obligations to Charlie, and he owed Charlie a duty of reasonable care. He further admits that Charlie could bring a negligence claim against him for actions that occurred prior to her birth. Dr. Batley also acknowledges in briefing that he "cannot discern the legislature's intent as to whether an unborn or minor child is or should be a 'patient' within the meaning of WIS. STAT. § 448.30." Nonetheless, Dr. Batley does not concede that Charlie was a patient under the statute. He leans on guidance from an American College of Obstetricians and Gynecologists (ACOG), Committee Opinion that posits, "it is more helpful to speak of the obstetrician-gynecologist as having beneficence-based *motivations* toward the fetus of a woman who presents for obstetric care and a beneficence-based *obligation* to the pregnant woman who is the patient." Am. Coll. of Obstetricians & Gynecologists, *Committee Opinion No. 664*, *Refusal of Medically Recommended Treatment During Pregnancy*, OBSTETRICS & GYNECOLOGY, 3 (2016) (italics in original). During oral argument Dr. Batley continued to insist that Charlie is not a patient under the statute, but he did not elaborate on how the ACOG guidance advanced his argument.

¶24    We determine that Charlie was Dr. Batley's patient prior to her birth. Dr. Batley indisputably provided medical care to Charlie by, for example, monitoring her condition, conducting an ultrasound, monitoring her vitals at the hospital, and being prepared to otherwise intervene.  And while *Pierce*, 278 Wis. 2d 82, and *Preston*, 307 Wis. 2d 704, were not informed consent cases—and not dispositive to our question here—those decisions are persuasive in that each confirms a common and reasonable understanding that a "patient" can include an unborn child. As Dr. Batley was providing medical care for Charlie prior to her birth, she was his patient.

¶25    Of import, an informed consent claim is an iteration of a negligence claim. Rather than a general duty of care, it specifies a certain professional duty, now codified in § 448.30. In other words, an informed consent claim is a claim that a physician negligently failed to properly inform a patient. We see no legal reason why Dr. Batley would owe a duty of reasonable care to Charlie or owe professional or ethical obligations to Charlie, but he would not owe a similar duty to Charlie as his patient in

the context of informed consent.[11] Based on the above, we conclude that Charlie was a "patient" under § 448.30.

## C.   Wisconsin Stat. § 448.30(2) AND (6) DO NOT RELIEVE A PHYSICIAN OF THEIR DUTY TO INFORM WHEN PROVIDING TREATMENT TO ALL MINOR AND UNBORN CHILDREN.

¶26   Dr. Batley contends that, even assuming Charlie was a patient, summary judgment was appropriate because two statutory exceptions relieve him of the duty to obtain informed consent when providing treatment to Charlie. Dr. Batley relies on § 448.30(2) which says that physicians are not required to disclose "[d]etailed technical information that in all probability a patient would not understand," and § 448.30(6) which says physicians are not required to disclose "[i]nformation in cases where the patient is incapable of consenting." Dr. Batley argues that Charlie, both before and after birth, could not understand technical information and was incapable of consenting.

¶27   We first dispatch with Dr. Batley's argument regarding § 448.30(2). Subsection (2) concerns a category of information that

---

[11] This holding is consistent with *Vandervelden v. Victoria*, 177 Wis. 2d 243, 502 N.W.2d 276 (Ct. App. 1993). In *Vandervelden* the plaintiff brought a battery action against a physician for an unsuccessful abortion attempted when the plaintiff was at less than eight weeks of gestation. *Id.* at 247. The physician argued he could not be held liable for battery because he obtained consent from the birth mother to perform the procedure. *Id.* The circuit court permitted the battery claim to proceed after determining that the birth mother's consent was irrelevant to the fetus and that the fetus themself would have to provide consent. *Id.* The court of appeals reversed, determining that the birth mother's consent was relevant to the fetus and shielded the physician from liability. *Id.* at 248-49. In that context, the court clarified that the notion of independent fetal consent had "no basis in the law." *Id.* at 251. The court determined that there may be a negligence claim against the physician, but no battery claim. *Id.* at 253. We take zero issue with *Vandervelden's* conclusion that there is no basis in law to support the idea that an unborn child themself can give or withhold consent. Additionally, we confirm that a birth mother may provide informed consent on behalf of an unborn child. Finally, *Vandervelden* recognized that the plaintiff may have a claim for negligence, just as we recognize that modern informed consent law is based in negligence and not battery.

physicians need not convey: detailed technical information. It does not concern whether the specific patient being treated is capable of understanding the information conveyed. This is evidenced by the use of the general article "a patient" in subsection (2), as opposed to the specific article "the patient" as used in subsections (3) through (7). Although subsections (3) through (7) reference circumstances that may change from patient to patient, subsection (2) is the same for any patient. There is no argument or suggestion that the risk of shoulder dystocia or the alternative of a cesarian section fall into the category of detailed technical information that a patient would not understand under § 448.30(2).

¶28     Now, turning to § 448.30(6). Dr. Batley's interpretation of § 448.30(6) would categorically excuse a physician from a duty to provide information before obtaining consent to treat any minor child or incompetent person since neither category of people is capable of giving legal consent. Section 448.30 establishes that physicians have a uniform duty to provide adequate information before obtaining consent (when circumstances allow).[12] Under Dr. Batley's interpretation, the exception would swallow the rule. The language of the statute does not permit such broad and categorical exceptions to the general rule. Indeed, when the legislature makes rules or exceptions for minors, they generally do so expressly.[13] But here, there is no reference to age or any indication that all minor children are categorically outside the scope of § 448.30.

¶29     Also, *Scaria*, which recognized the common law cause of action for informed consent prior to the passage of § 448.30, acknowledged that consent for a minor would likely be provided by a parent or guardian. *Scaria*, 68 Wis. 2d at 13 n.3. If § 448.30 was intended to contravene the common law expectation that a parent or guardian would provide informed consent on behalf of a minor child, the legislature

---

[12] *See generally*, *Schreiber v. Physicians Ins. Co. of Wis.*, 223 Wis. 2d 417, 427, 588 N.W.2d 26 (1999); *Martin v. Richards*, 192 Wis. 2d 156, 169, 531 N.W.2d 70 (1995); *Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis. 2d 1, 12–13, 227 N.W.2d 647 (1975).

[13] *See, e.g.*, WIS. STAT. §§ 103.64–103.82 (establishing various rules and exceptions related to minors in employment regulation); WIS. STAT. § 155.10 (specifying various duties that must be done by one "who has attained age 18" in the context of a power of attorney for health care").

would need to be explicit. *See Fuchsgruber v. Custom Accessories, Inc.*, 2001 WI 81, ¶25, 244 Wis. 2d 758, 628 N.W.2d 833 ("A statute does not change the common law unless the legislative purpose to do so is clearly expressed in the language of the statute.").

¶30    The only reasonable interpretation of the statute requires that a physician provide the necessary information to the individual making medical decisions on behalf of the patient (so long as no other exceptions apply). This ensures that the medical decisionmaker has the requisite information in order to give *informed* consent.[14]

¶31    This interpretation is also consistent with other relevant provisions of the Wisconsin statutes. For example, WIS. STAT. ch 155 governs power of attorney for health care. It says that unless provided otherwise, "the health care agent who is known to the health care provider to be available to make health care decisions for the principal has priority over any individual other than the principal to make these health care decisions." WIS. STAT. § 155.20(1). This provision clearly contemplates that health care providers must obtain consent from a health care agent before providing medical care in some circumstances. It would be inconsistent if the legislature required a physician to obtain consent in this circumstance, but did not require a physician to appropriately inform a health care agent before obtaining that consent.

¶32    In addition, several statutes require informed consent from a parent or guardian before medical testing or treatments may be pursued for a child. *See* WIS. STAT. § 51.61(6) (requiring informed consent of a parent or guardian for a minor receiving mental health services under that chapter with some exceptions); § 253.115(6)(b) (requiring parents or guardians be given full information and the opportunity to object before an infant hearing screening is performed); § 253.13(3) (requiring parents or guardians be given full information and the opportunity to object before tests for congenital disorders are performed). It would make little sense

---

[14] Amici appear to agree on this point. The American Medical Association, Wisconsin Medical Society, Wisconsin Hospital Association, and American College of Obstetricians & Gynecologists, acknowledge in their joint brief that the informed consent doctrine "is a bilateral duty that exists between the physician providing information and the person responsible for providing consent, *either as the patient or for the patient*." (emphasis added).

for the legislature to single these procedures out as requiring informed consent from a parent or guardian, but to allow other significant health care decisions—such as a decision for a child to undergo surgery or receive cancer treatment—to be made without informed consent.[15]

¶33    To summarize, Charlie was Dr. Batley's patient prior to birth, Samantha exercised consent to medical treatment on behalf of both herself and Charlie, and Samantha was capable of providing consent. As such, Dr. Batley had a duty pursuant to § 448.30 to obtain informed consent from Samantha on Charlie's behalf.

### D.  SAMANTHA NEED NOT BE JOINED AS A PARTY.

¶34    Dr. Batley next contends that, even if he was required to obtain informed consent from Samantha on Charlie's behalf, only Samantha may bring an informed consent claim to recover Charlie's damages. According to Dr. Batley, even assuming Charlie could pursue an informed consent claim, it would be derivative of Samantha's claim, or Samantha would have to be joined to the suit under WIS. STAT. § 803.03. Since Samantha did not bring this action and was not joined to this case as a plaintiff, Dr. Batley believes Charlie's claim cannot survive and summary judgment was therefore appropriate. We disagree.

¶35    We first reject Dr. Batley's contention that Charlie's claim is derivative. "[A] derivative claim arises from the tort injury to another; it does not have its own elements of proof that are distinct from the negligence claim to which it attaches; and it must be joined in the same action that brings the primary personal injury claim." *Phelps v. Physicians Ins. Co. of Wis., Inc.*, 2009 WI 74, ¶63, 319 Wis. 2d 1, 768 N.W.2d 615. To succeed on a negligence claim, including an informed consent claim, a plaintiff must prove four elements: (1) duty, (2) breach, (3) causation, and (4) damages. *Hubbard v. Neuman*, 2024 WI App 22, ¶21, 411 Wis. 2d 586, 5 N.W.3d 852.

---

[15] This court has previously recognized a child's claim pursuant to WIS. STAT. § 448.30 under the theory that the child's father was owed additional information. *See Martin*, 192 Wis. 2d 156. Although the parties did not directly litigate the issue of whether a physician owes a duty to inform a child's parent under § 448.30, we allowed the claim to survive after a thorough review of the history and applicability of § 448.30. *Id.*

¶36    Dr. Batley's argument is flawed because he does not account for the fact that he owed two independent duties: (1) a duty to inform Samantha on Samantha's behalf, and (2) a duty to inform Samantha on Charlie's behalf. While Dr. Batley's duty to Charlie had to be discharged through Samantha, the duty was to Charlie herself. Samantha had the right to provide consent for any medical treatment that affected her body, but she also carried the right, on Charlie's behalf, to provide consent for medical treatment that affected Charlie. As such, Charlie's informed consent claim is not reliant on Samantha establishing negligence as to herself.

¶37    Rather, Charlie's claim is that: Dr. Batley owed a duty *to Charlie* to properly inform Samantha of the reasonable alternate modes of treatment and the benefits and risks of these treatments to Charlie under § 448.30; Dr. Batley breached that duty to Charlie by failing to inform Samantha of the risk of shoulder dystocia and the availability of a cesarian section; and Charlie was damaged as a result. These elements are yet to be proven, but each element is distinct as to Charlie and separate from any tort claim Samantha might bring.

¶38    Indeed, it is helpful to conceptualize Charlie's claim as akin to a claim for fetal injury, which we have recognized attaches to a child, not the child's parents, once the child is born alive. *See State ex rel. Angela M.W. v. Kruzicki*, 209 Wis. 2d 112, 130–31, 561 N.W.2d 729 (1997) (describing how injuries suffered before birth "impose a conditional liability on the tort-feasor" which attaches or becomes actionable once the child is born and becomes a legal person (quoting *Puhl v. Milwaukee Auto. Ins. Co.*, 8 Wis. 2d 343, 356, 99 N.W.2d 163 (1959), *overruled on other grounds by In re Stomosted's Estate*, 99 Wis. 2d 136, 299 N.W.2d 226 (1980))). As Charlie was born alive, her informed consent claim attaches to Charlie herself, and the claim is not derivative.[16]

---

[16] Justice Bradley cites Wisconsin's feticide statute, WIS. STAT. § 940.04, to decry our determination that, as she was born alive, Charlie had an independent right to pursue an informed consent claim. Justice Bradley's concurrence/dissent, ¶88. Reliance on that statute is a red herring. Setting aside that the definitions of "unborn child" the concurrence/dissent cites are explicitly limited to "in this section," *see* § 940.04(6), and "in this chapter," § 48.02, and therefore not relevant to § 448.30, nothing said is relevant to our holdings in this case related to the existence of a § 448.30 claim for Charlie.

¶39    Similarly, we see no reason why Samantha would be a necessary party to Charlie's claim under § 803.03.[17] Dr. Batley's arguments on this topic are underdeveloped and conclusory. Dr. Batley argues that Samantha need not pursue a claim on her own behalf to be a necessary party under § 803.03, but Dr. Batley cites nothing in support of this position and does not address how § 803.03 operates if Samantha has no claim at all, as is the case here. Therefore, we reject Dr. Batley's argument that Charlie's informed consent claim must fail because Samantha is not a party to this lawsuit.

E.  HOLDING THAT CHARLIE IS A PATIENT UNDER WIS. STAT. § 448.30 DOES NOT CREATE CONFLICT BETWEEN PREGNANT PATIENTS AND THEIR UNBORN CHILDREN.

¶40    Charlie's appeal has focused significantly on how her claim would proceed if she is determined to be a patient under § 448.30. She contends that the causation question should be whether a "reasonable baby" in Charlie's position would have chosen to be born via a cesarian section. She has also argued that although Samantha has the right to provide informed consent on behalf of Charlie, "only Charlie's best interests would be material to [Samantha's] analysis." In response, Dr. Batley argues that our holding could create conflicts between the duty owed to pregnant patients and the duty owed to unborn children.

---

[17] WISCONSIN STAT. § 803.03(1) reads:

**(1)**  PERSONS TO BE JOINED IF FEASIBLE. A person who is subject to service of process shall be joined as a party in the action if:
> **(a)** In the person's absence complete relief cannot be accorded among those already parties; or
> **(b)** The person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may:
>> **1.** As a practical matter impair or impede the person's ability to protect that interest; or
>> **2.** Leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of his or her claimed interest.

According to Dr. Batley, such implications would be "dire."

¶41    We pause here to address these arguments and clarify that Charlie's status as a patient under § 448.30 does not create conflict between pregnant patients and their unborn children. For one thing, the duty under § 448.30 is to inform. There is no conflict in simply giving a pregnant patient full and complete information about reasonable alternate modes of treatment and the benefits and risks of those treatments to both herself and the unborn child. Although the common law obligation underpinning the duty to inform is the obligation to obtain consent before treating a patient, there is no duty to obtain a particular decision from the decisionmaker.

¶42    Second, Charlie is incorrect about how causation works in circumstances where the patient is not the medical care decisionmaker. To prevail on an informed consent claim a plaintiff generally must prove that: (1) the doctor was negligent in informing the patient about the availability of reasonable alternate medical modes of treatment and about the risks and benefits of these alternate treatments, and (2) that the negligence of the doctor in informing the patient was a cause of injury to the patient. *See* Wis. JI-Civil 1023.1. As to the second element, an objective standard is applied—whether a "reasonable person" in the patient's position would have made a different decision had they been informed. *Schreiber*, 223 Wis. 2d 417 at ¶35.[18]

---

[18] In *Schreiber*, this court stated:

The objective test focuses on what the attitudes and actions of the reasonable person in the position of the patient would have been rather than on what the attitudes and actions of the particular patient of the litigation actually were. It asks two questions. First, did the physician fail to give information that a reasonable patient would want to know? . . . Second, given the additional information, would the reasonable patient have acted differently than they did without the information?"

588 N.W.2d 26, ¶35 (citations omitted). The 2013 change to WIS. STAT. § 448.30 replaced the first objective question described in *Schreiber* with a "reasonable physician standard." No one has argued that this change affected the second objective question described in *Schreiber* relating to causation.

¶43    As explained above, § 448.30 applies both when consent is obtained from the patient and when consent is obtained from someone on behalf of the patient. When another individual is making a health care decision on behalf of a patient, it would be illogical for the causation question to ask what a reasonable person in the patient's position would choose. The patient (or any reasonable person in the patient's same position) is unable to make that decision. As such, the causation inquiry is whether a reasonable person *in the decisionmaker's position* would have made a different decision had they been appropriately informed and whether that decision would have avoided injury.

¶44    In this case, Samantha was the decisionmaker for Charlie.[19] So, were the jury to determine that Dr. Batley did not satisfy the requirements of § 448.30, the causation question would be two-fold. First, whether a reasonable person in Samantha's position, considering the risks and benefits to her as well as Charlie, would have made a different treatment decision had she been told about the option of a cesarian section to mitigate the risks of shoulder dystocia. And second, whether Samantha's different decision would have avoided Charlie's injury. This inquiry creates no conflict between duties owed to Samantha and the duties owned to Charlie. And this inquiry creates no conflict, in general, between duties owed to pregnant patients and duties owed to unborn children.

¶45    Furthermore, the fact that an unborn child is a patient under § 448.30 cannot override a pregnant patient's right to her own bodily integrity and autonomy.[20] Indeed, a physician simply cannot treat a

---

[19] Justice Ziegler posits in her concurrence/dissent that the surrogacy agreement is relevant to this case. We disagree. At this stage, the parties do not dispute the terms of the surrogacy agreement and have made no relevant arguments that rely on the agreement.

[20] Justice Bradley pushes back on this statement, but the argument is a non sequitur. *See* Justice Bradley concurrence/dissent, ¶99. Yes, there are statutes that allow the state to invade the province of individual autonomy (*see, e.g.*, WIS. STAT. § 51.20, allowing for a person to be held and forcibly medicated under certain circumstances). However, the discussion of such statutes is not relevant to Charlie's claim under § 448.30. So, we reiterate: the fact that an unborn child is a patient under § 448.30 cannot itself override a pregnant patient's right to her own bodily integrity and autonomy.

pregnant patient who withholds her consent to do so, no matter the effect on the child, barring an applicable exception. To state the obvious, any medical treatment or procedure for an unborn child necessarily affects the pregnant patient. This is why the pregnant patient is always responsible for making medical decisions for an unborn child (unless one of the statutory exceptions applies). And nothing in § 448.30 relates to or limits the basis upon which she may make her decision. Once a physician provides the necessary information as it relates to both patients, the physician has discharged their duty under § 448.30 and cannot be held liable under a theory of informed consent for a pregnant patient's ultimate decision.[21]

¶46 Importantly, our holding does not introduce or expand rights afforded to an unborn child. Rather, just as in any claim for negligence concerning an unborn child, it protects the right of a born child to recover for wrongs done before she was born. *See Kruzicki*, 209 Wis. 2d at 131 n.13 ("Judicial recognition of a live-born child's right to recover damages for tortious prenatal injury . . . focuses on the need for compensation of a living person wrongfully injured rather than on the legal status of the fetus." (citation omitted)). We are also far from the first jurisdiction to recognize that a child has an independent claim for failure to obtain informed consent on her behalf prior to birth.[22] As such, this

---

[21] According to Justice Hagedorn, some of this discussion does not respond to arguments or issues before us, and is unnecessary to the disposition of the case we are deciding." *See* Justice Hagedorn's concurrence, ¶61, n.1. Not so. Again, we must address Charlie's argument that "only Charlie's best interests would be material to [Samantha's] analysis." This position improperly subordinates Samantha's bodily integrity and autonomy. We endeavor to be crystal clear on this point: a birth mother's bodily integrity and autonomy are paramount.

[22] *See, i.e, Draper v. Jasionowski*, 858 A.2d 1141, 1148 (N.J. Super. Ct. App. Div. 2004) ("We hold that New Jersey recognizes an independent cause of action on behalf of an infant, on reaching majority, against the child's mother's obstetrician, for prenatal injuries . . . arising out of the failure of the physician to obtain the child's mother's informed consent, prior to the child's delivery."); *Roberts v. Patel*, 620 F. Supp. 323, 326 (N.D. Ill. 1985) ("[I]n light of Illinois' recognition of a protectable interest in the fetus in ordinary malpractice claims . . . we hold that [plaintiff's] mother's physicians owed a duty of informed disclosure not only to [plaintiff]'s mother, but to [plaintiff] as well[.]"); *Hughson*

holding does not represent any large shift in how the law currently operates and should not have "dire implications" as Dr. Batley fears.

### F.  DR. BATLEY'S REMAINING ARGUMENTS FAIL.

¶47    Dr. Batley raises three additional reasons why the circuit court was correct in dismissing Charlie's informed consent claim. We reject each of them in turn.

¶48    First, Dr. Batley asserts that Charlie "has forfeited and waived any right to recovery on a duty owed to [Samantha] by asserting patently implausible theories and arguments" to the circuit court. According to Dr. Batley, Charlie's theory of the case has changed since it was presented to the circuit court so the circuit court never addressed some of her arguments. *See Hopper v. City of Madison*, 79 Wis. 2d 120, 137, 256 N.W.2d 139 (1977) ("It is the practice of this court not to consider issues raised for the first time on appeal since the trial court has had no opportunity to pass upon them."). Although Charlie presented additional arguments to the circuit court, it is clear from the filings that Charlie argued that "[t]he Minor Plaintiff, Charlie Brekke can bring an informed consent claim on her own behalf," and that she "has an independent cause of action." As such, the issues here were adequately raised to the circuit court and not forfeited.

¶49    Dr. Batley next asserts that he was entitled to summary judgment because the undisputed evidence fails to establish that he breached his duty to properly inform Samantha. In support, Dr. Batley points to WIS. STAT. § 802.08(3), which provides that a non-moving party to a motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial." Dr. Batley further cites evidence that he contends establishes that he never breached the reasonable physician standard with respect to his disclosure obligations.

¶50    There is a fatal threshold problem with this argument. Section 802.08(3) requires the non-moving party to submit evidence in

---

*v. St. Francis Hosp. of Port Jervis*, 92 A.D.2d 131, 138 (N.Y. App. Div. 1983) ("The choice or decision is the mother's, but it must be made with knowledge of the risks to her unborn child. To the latter, an independent duty of disclosure, via the mother, is owed.").

support of their claim "[w]hen a motion for summary judgment is made and supported." Dr. Batley did not make and support a motion for summary judgment based on the evidence of record. Rather, Dr. Batley's motion for partial summary judgment was expressly limited to his assertion that Charlie was not owed any duty under Wis. Stat. § 448.30 as a matter of law. Consequently, in response to that argument Charlie raised arguments with respect to that legal question. Charlie was not obliged to mount an evidence-based defense to a summary judgment argument that Dr. Batley did not raise.[23] As a result, Dr. Batley was not entitled to summary judgment based on the evidence of record.

¶51    Finally, Dr. Batley argues that a remand to the circuit court for a trial on the informed consent claim would be improper because the zero-dollar damages verdict as to negligence moots any claim for damages arising from a violation of the informed consent claim. This argument relies on an underdeveloped premise and conclusory reasoning about when a case becomes moot.

¶52    To lay the foundation for his mootness argument, Dr. Batley asserts—without citation or record evidence—that Charlie's injuries would be the same whether they arose from the negligence claim or the informed consent claim. But as the informed consent claim did not go to trial, there is no basis in the record to make such a finding.

¶53    Building on the unproven premise that the damages for the negligence and informed consent claims are necessarily the same, Dr. Batley asserts that Charlie waived any challenge to the damages verdict. Specifically, he contends that Charlie waived this challenge by failing to object to the jury form at conference for the negligence trial pursuant to Wis. Stat. § 805.13(3).[24] Dr. Batley then asserts that because Charlie may

---

[23] In any event, the evidence of record Dr. Batley cites in support of his assertion does not cut as neatly in Dr. Batley's favor as he suggests. There remains a genuine dispute of material fact on this issue.

[24] Wis. Stat. § 805.13(3) reads:

Instructions and verdict conference.   At the close of the evidence and before arguments to the jury, the court shall conduct a conference with counsel outside the presence of the jury. At the conference, or at such earlier time as the court reasonably directs,

not challenge the damages verdict, her appeal is moot. But Dr. Batley offers no authority or argument supporting the proposition that § 805.13(3) requires a party to object to a verdict form related to a claim dismissed at summary judgment. And he likewise fails to direct us to any authority in which a court determined that a case was moot in similar circumstances.[25] As such, we do not find this case to be moot.

## IV. CONCLUSION

¶54    We hold that Charlie May Brekke was a patient under § 448.30 before her birth. Dr. Batley had a duty to obtain informed consent from Samantha regarding herself and Charlie. As Charlie was born alive, she had an independent right to pursue an informed consent claim. Consequently, we reverse the circuit court's decision granting partial summary judgment to the defendants and remand this case to the circuit court for further proceedings on Charlie's informed consent claim.

*By the Court.*—The decision of the circuit court is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

counsel may file written motions that the court instruct the jury on the law, and submit verdict questions, as set forth in the motions. The court shall inform counsel on the record of its propose action on the motions and of the instructions and verdict it proposes to submit. Counsel may object to the proposed instructions or verdict on the grounds of incompleteness or other error, stating the grounds for objection with particularity on the record. Failure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict.

[25] On remand, our conclusion here does not limit the parties' ability to raise other arguments related to the preclusive effect of any rulings or findings made during the trial on the negligence claim.

BRIAN K. HAGEDORN, J., concurring.

¶55    Today, the majority correctly holds that Charlie was a "patient" prior to her birth under WIS. STAT. § 448.30, and that Charlie's informed consent claim is independent of her surrogate mother. I agree with these holdings and therefore concur in the judgment. But while much of the majority opinion's reasoning is sound, the opinion also contains broad statements and digressions that go beyond the issues in this case.

¶56    For example, Justices Ziegler and Bradley rightly highlight the opinion's overly capacious language in describing who the medical decision-maker might be in situations different from the one we are reviewing. As the majority acknowledges, everyone agrees that the surrogate mother had the authority to make medical decisions for Charlie. So any theorizing about who might have the authority to make that decision in a different case is irrelevant.

¶57    The majority's language is also confusing in some places. It says, for example, "As Charlie was born alive," her informed consent claim can be independently pursued. Majority op., ¶¶2, 38, 54. The opinion reasons in part that in a claim for fetal injury, a child who is born alive can bring an independent claim, and by the same logic, Charlie can bring an independent informed consent claim. *Id.*, ¶38. Insofar as this reasoning by analogy supports the existence of an independent claim for Charlie, I agree. But Justice Crawford exploits this ambiguity and incorrectly says the majority holds "that Charlie's independent cause of action based on a failure of informed consent during pregnancy or birth attached when she was born alive." Concurrence, ¶71. The majority holds no such thing. It can't, because when that claim attached isn't at issue. Charlie was born alive, so the question of whether such a claim could exist had Charlie died in utero is not before us. The question the majority answers is whether Charlie can bring an independent claim; the court is unanimous that she can.

¶58    The opinion is also unclear to some members of the court with regard to Charlie's status as a patient. Justice Crawford contends the majority holds that Charlie was a patient receiving treatment "at the time of the pregnant patient's decision." *Id.*, ¶62. I do not know what "decision" this refers to or how it relates to Charlie's status as a patient. The majority, in contrast, focuses on the language of the statute, not any

particular time a decision was made. Similarly, Justice Ziegler says, "It seems, according to the majority, that Charlie being 'born alive,' is what qualifies her to be a 'patient' entitling her to an informed consent claim." Justice Ziegler's concurrence/dissent, ¶76. But no part of the majority conditions the status of Charlie as a patient under Wis. Stat. § 448.30 on her being born alive. If this language causes confusion even among the court, it carries the risk of doing worse in the hands of enterprising litigators.

¶59    The subtext running through these problems is the apparent wariness of ascribing personhood to the unborn child. Some members of the court are afraid of their own shadow, supposing the correct ruling in this case may have downstream effects on abortion law. The court, for example, clarifies that "our holding does not introduce or expand rights afforded to an unborn child," punctuated by the flashing neon adverb "Importantly." It's almost as if the majority is worried that law and logic will operate as a dangerous undercurrent that might accidentally lead to dignifying unborn children too much.

¶60    Rather than fret about these matters, we do well to simply follow the law—here, the language of the statute. To my mind, the majority rightly focuses on the meaning of Wis. Stat. § 448.30—a statute based on modern negligence law. And that body of law has long recognized the independent humanity of the unborn child. Unborn children are, from the time of their distinct human personhood in their mother's womb, "patients" who are owed informed consent through their medical decisionmaker. It does not matter whether these persons are small or large. It does not matter whether their fingers are fully formed, or whether their heart has begun its rhythmic pulse. Every expectant mother and father eager to watch their baby on the ultrasound or to hear their child's heartbeat expects professional medical care for both mom and child—two patients owed informed consent under § 448.30, regardless of the unborn child's gestational age.

¶61    The majority opinion has much to commend it. It gets the statute right: Charlie has the right to informed consent as a patient under Wis. Stat. § 448.30, and she may independently bring a claim for the breach of that right. But the opinion also contains uncareful language that

could lead future litigants astray.[1] In view of this, although I agree with much of the opinion and its core legal conclusions, I respectfully concur in the judgment only.

---

[1] Some of this is classic dicta because it does not respond to arguments or issues before us and is unnecessary to the disposition of the case we are deciding. *Wisconsin Just. Initiative, Inc. v. WEC*, 2023 WI 38, ¶¶138, 141–42, 407 Wis. 2d 87, 990 N.W.2d 122 (Hagedorn, J., concurring) (explaining that when opinions "describe a prior opinion or legal doctrine tangential to an issue, but not necessary for resolution of the case," that is nonbinding dicta; only "the legal rationale underlying and necessary to a decision" is precedential).

SUSAN M. CRAWFORD, J., with whom JILL J. KAROFSKY, C.J., joins, concurring.

¶62    This case centers on a pregnant patient's decision to proceed with an induced vaginal birth instead of a cesarian section. The majority opinion, which I join, holds that, at the time of the pregnant patient's decision, the unborn child was also a patient receiving treatment under Wisconsin's informed consent law and that, following her live birth, the child could assert a claim for injuries caused by the alleged failure of informed consent during the pregnancy or birth. I write separately to emphasize that today's decision upholds the rights of pregnant patients to make medical decisions implicating their bodily integrity and self-determination. I also explain why the decision does not fundamentally change a physician's obligations in complying with the implied consent law when providing treatment during pregnancy and birth, as Dr. Batley and the amici contend.[1] Finally, I briefly discuss why the majority is correct in holding that the child has a cause of action for injuries caused by a lack of informed consent during the pregnancy and birth, upon being born alive.

## I.  THE RIGHTS OF PREGNANT PATIENTS TO BODILY INTEGRITY AND SELF-DETERMINATION

¶63    Informed consent is a bedrock principle in the practice of medicine that "stems from the fundamental notion of the right to bodily integrity." *Martin v. Richards*, 192 Wis. 2d 156, 169, 531 N.W.2d 70 (1995); *see also* majority op., ¶17. Wisconsin's informed consent statute imposes a duty on physicians to "inform the patient about the availability of reasonable alternate medical modes of treatment and about the benefits and risks of these treatments" so they can provide or withhold their informed consent. WIS. STAT. § 448.30. Thus, the purpose of the statute is to allow patients to make informed decisions about medical treatments. The statute codified the right recognized at common law "that an adult has a right to determine what shall be done with [their] own body . . . ."

---

[1] The American Medical Association, Wisconsin Medical Society, Wisconsin Hospital Association, and American College of Obstetricians & Gynecologists filed a joint amicus brief in support of the defendants.

*Schreiber v. Physicians Ins. Co. of Wis.*, 223 Wis. 2d 417, 426–27, 588 N.W.2d 26 (1999) (citation modified).

¶64 Put another way, "the concept of informed consent developed out of the right of every person to refuse unwanted medical treatment and control what is done to [their] body." *Hannemann v. Boyson*, 2005 WI 94, ¶43, 282 Wis. 2d 664, 698 N.W.2d 714. It is "premised on the notion that a person of sound mind has a right to determine, even as against [their] physician, what is to be done to [their] body." *Id.*, ¶34. This court has further described these rights as "emanat[ing] from the common law right of self-determination and informed consent, the personal liberties protected by the Fourteenth Amendment, and from the guarantee of liberty in Article I, section 1 of the Wisconsin Constitution." *In re Guardianship of L.W.*, 167 Wis. 2d 53, 67, 482 N.W.2d 60 (1992).

¶65 As we recognize in our decision today, when the patient is pregnant, § 448.30 requires the physician to inform the pregnant person of the benefits and risks of the reasonable alternate modes of treatment affecting both the pregnant patient *and* the developing fetus. *See Dumer v. St. Michael's Hosp.*, 69 Wis. 2d 766, 775, 233 N.W.2d 372 (1975) (recognizing negligence claim based on doctor's failure to inform pregnant woman of the probable effects of rubella on her fetus). Our decision correctly recognizes that, during pregnancy, the pregnant patient has the right and responsibility to grant or withhold consent to medical treatment on behalf of both herself and the unborn child. *See* majority op., ¶30. In reaching this conclusion, we uphold the pregnant patient's autonomy to direct what happens to her own body. One legal scholar described the complexity of a pregnant patient's exercise of informed consent as follows:

> [I]f the woman and fetus are considered two independent beings, then the tension between them can create the threat of undermining the woman for the sake of the fetus—a tension and struggle that should never be valid because ultimately the woman is the only agent with rights to direct her own body. Recognizing the status of pregnancy should be done for the purpose of supporting the pregnant person's autonomy and dignity and to protect the unique relationship, rather than to undermine the woman's personhood for the sake of the fetus that grows inside her. The context and purpose of recognizing pregnancy matters.

Pamela Laufer-Ukeles, *The Disembodied Womb: Pregnancy, Informed Consent, and Surrogate Motherhood*, 43 N.C. J. INT'L L. 96, 109–10 (2018).

¶66    As the amici emphasize, a particular treatment alternative may pose different relative benefits and risks to the pregnant patient and the unborn child: a proposed treatment that poses less risk for the pregnant person may pose a greater risk to the fetus, and vice versa. As the American College of Obstetricians and Gynecologists states: "[a] patient who is pregnant is fully capable of making medical care decisions during pregnancy and during labor and delivery, even if those decisions are in disagreement with obstetrician-gynecologists or family members, involve withdrawal of life-sustaining treatment, or may adversely affect the health of the fetus."[2]

¶67    The facts here illustrate the often-difficult, complex choices pregnant patients must make on behalf of themselves and their unborn children. Samantha may have chosen to proceed with a vaginal birth with full knowledge that it posed a greater risk of birth injury to the child than a cesarean section, but a lower risk of complications to her. Charlie's legal claim centers on whether Dr. Batley, under the reasonable physician standard, properly informed Samantha of those relative risks and benefits so that she could make an informed decision on behalf of both herself and the unborn child. Pregnant patients may literally be forced to make life-or-death decisions, or decisions with long-term health consequences, for themselves or their unborn children. The majority's decision recognizes that only the pregnant patient has the agency to make such decisions during pregnancy and birth, on behalf of both herself and the unborn child. To hold otherwise would undermine the pregnant patient's rights to her own bodily integrity and self-determination emanating from Article I, Section 1 of the Wisconsin Constitution, which declares that "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness." WIS. CONST. ART. I, § 1.

---

[2] Am. Coll. of Obstetricians & Gynecologists Committee Opinion No. 819, *Informed Consent and Shared Decision Making in Obstetrics and Gynecology*, 137 OBSTETRICS & GYNECOLOGY e34, e39 (2021), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2021/02/informed-consent-and-shared-decision-making-in-obstetrics-and-gynecology.

## II.  THE PHYSICIAN'S OBLIGATION IN OBTAINING INFORMED CONSENT UNDER WIS. STAT. § 448.30

¶68    I also write to underscore that the majority's decision does not interfere with the established practices of obstetrician-gynecologists in obtaining informed consent during pregnancy. The decision does not require physicians to engage in a fictitious exercise of obtaining consent to treatment first from the pregnant woman on her own behalf, and a second time on behalf of the unborn child. An effort to obtain separate consent would distort and oversimplify the complexity and interrelatedness that are intrinsic to a pregnant patient's decision-making. *See* Laufer-Ukeles at 143 (citing Am. Coll. of Obstetricians & Gynecologists Committee Opinion No. 321, *Maternal Decision Making, Ethics and the Law*, 106 OBSTETRICS & GYNECOLOGY (2005)).[3] Assuming that a physician, under the "reasonable physician" standard established in WIS. STAT. § 448.30, properly informs a pregnant patient about alternate medical modes of treatment and of the benefits and risks both to the pregnant patient and the fetus of such treatment, the physician's obligations under the law are met. The decision of this court does not alter the manner in which a physician obtains informed consent or inherently increase a physician's risk of liability when providing treatment during pregnancy and birth.

¶69    Nor does § 448.30 provide an avenue for second guessing a patient's informed decision. As the majority holds, the pregnant patient provides consent to treatment during pregnancy and birth on behalf of herself and the unborn child. *See* majority op., ¶30. The statute requires only that a physician provide adequate information to the patient under the reasonable physician standard. The statute imposes no further duty on

---

[3] The committee opinion referenced here has since been superseded by a more recent opinion supporting the same proposition. *See* Am. Coll. of Obstetricians & Gynecologists Committee Opinion No. 664, *Refusal of Medically Recommended Treatment During Pregnancy* (2016) (reaffirmed 2025), https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2016/06/refusal-of-medically-recommended-treatment-during-pregnancy (stating that the opinion "recognizes the centrality of the pregnant woman's decisional authority and the interconnection between the pregnant woman and the fetus").

the physician to ensure that the decision the patient makes is in her—or the unborn child's—best medical interest. *Id.*, ¶40.

¶70    For over thirty years, Wisconsin physicians have been able to avoid liability under § 448.30 when providing treatment during pregnancy and birth by adequately informing pregnant patients of the benefits and risks both to the pregnant patient and the fetus, and obtaining the pregnant patient's consent to that treatment on behalf of both patients. We do not disturb this longstanding precedent today.

## III.  THE CHILD'S CAUSE OF ACTION UPON BEING BORN ALIVE

¶71    I also write to clarify that resolving whether the child, Charlie, may assert an informed consent claim under her own name does not end with the determination that she was a "patient" under WIS. STAT. § 448.30 during the pregnancy or birth, when the violation was alleged to have occurred. Under long-established Wisconsin law, the child must be born alive to bring such a claim under her own name. Thus, I briefly discuss why the majority is correct in recognizing that Charlie's independent cause of action based on a failure of informed consent during pregnancy or birth attached when she was born alive. *See* majority op., ¶2.

¶72    It has long been the law in Wisconsin that a child, once born alive, has a negligence cause of action for injuries sustained during pregnancy or birth. *See Puhl v. Milwaukee Auto. Ins. Co.*, 8 Wis. 2d 343, 355, 99 N.W.2d 163 (1959), *overruled on other grounds by In re Stromsted's Est.*, 99 Wis. 2d 136, 299 N.W.2d 226 (1980). If the child is not born alive, the parents have a cause of action for wrongful death.[4] *See Kwaterski v. State Farm Mut. Auto. Ins. Co.*, 34 Wis. 2d 14, 20, 148 N.W.2d 107 (1967). In *Kwaterski*, this court rejected the defendant's argument that there is no recovery under the wrongful death statute for a stillborn infant, clarifying its previous holding in *Puhl*:

> [I]n *Puhl* we were concerned only with making it clear that for an unborn infant who is injured during gestation *to have a*

---

[4] This case, of course, involves a surrogate. Legal questions relating to an *intended* parent's right to bring a wrongful death action, after a surrogate pregnancy results in a stillbirth, are beyond the scope of this opinion. No published Wisconsin case has addressed this scenario.

*cause of action in his own name and right that infant must be born
alive*. We were not discussing whether such an infant,
stillborn, would be a 'person' under that [wrongful death]
statute.

*Kwaterski*, 34 Wis. 2d at 18 (emphasis added). *Kwaterski* involved a
negligence claim brought by the Kwaterskis for the wrongful death of
their unborn child in a vehicle collision. The court recognized that the
stillbirth did not defeat the parents' cause of action, explaining that:

> If no right of action is allowed, there is a wrong inflicted for
> which there is no remedy. Denying a right of action for
> negligence acts which produce a stillbirth leads to some very
> incongruous results. For example, a doctor or a midwife
> whose negligent acts in delivering a baby produced the
> baby's death would be legally immune from a lawsuit.
> However, if they badly injured the child they would be
> exposed to liability. Such a legal rule would produce the
> absurd result that an unborn child who was badly injured by
> the tortious acts of another, but who was born alive, could
> recover while an unborn child, who was more severely
> injured and died as the result of the tortious acts of another,
> could recover nothing.

*Kwaterski* at 20. The court thus concluded that "a viable infant who
receives an injury and by reason thereof is stillborn is a 'person' . . . so as
to give rise to a wrongful death action *by the parents* of the stillborn
infant." *Id.* at 22 (emphasis added).

¶73     Justice Bradley's dissent misreads *Kwaterski* to the extent that
she argues it means the unborn *child's* informed consent claim survives the
unborn child's death. *Kwaterski* does not support this contention. It clearly
distinguishes between the *child's* negligence claim in her own name, which
requires that the child be born alive, and the *parents*' claim for wrongful
death, which may be brought if the unborn child dies.

¶74     As the majority recognizes, an informed consent claim is a
species of negligence claim. The longstanding law in Wisconsin is that a
child may bring a negligence cause of action for injuries sustained in
pregnancy or birth, if and when the child is born alive. If the child is not
born alive, the parents may have a cause of action for wrongful death.
This case presents no reason to revisit that precedent.

¶75     For these reasons, I respectfully concur.

ANNETTE KINGSLAND ZIEGLER, J., concurring in part and dissenting in part.

¶76    Answering the certified question from the court of appeals, the majority concludes that Charlie May Brekke (hereinafter "Charlie") was a "patient," and as "Charlie was born alive," she is entitled to informed consent from her surrogate mother's treating physician under WIS. STAT. § 448.30. Majority op., ¶2. It seems, according to the majority, that Charlie being "born alive," is what qualifies her to be a "patient" entitling her to an informed consent claim. However, the statute has no "born alive" requirement. I agree that Charlie is a "patient" under the statute, but I disagree with the majority imputing a temporal element into the statute.

¶77    The statute uses the term "patient" broadly, adopting none of the limiting principles that the majority assumes. *See* majority op., ¶¶21–24 (relying in part on definitions from "[o]ther Wisconsin statutes related to healthcare" and on two cases "not dispositive to our question here"). A "patient" under the statute, is anyone "who receives health care services from a health care provider." *Id.*, ¶21. In this case, the doctor provided a host of health care services to Charlie, long before birth. Inexplicably, the majority contorts the term "patient" to be something it is not. Instead, the plain meaning of the statute instructs that Charlie is a patient who is entitled to informed consent. *Id.*, ¶2.

¶78    Our analysis should stop here. The single question before the court is: "Whether an unborn child (or any minor child) is a patient under WIS. STAT. § 448.30 and thus entitled to informed consent with the independent right to pursue legal action against a physician who fails to comply with said statute." Certification by Wis. Ct. App., *Brekke v. Midwest Med. Ins. Co.*, No. 2023AP498, ¶2 (Apr. 9, 2025). Nonetheless, the majority reaches out to answer questions not before us and does so without any consideration of the surrogacy agreement.[1] The majority goes too far.

---

[1] This court upheld the enforceability of surrogacy agreements in *Rosecky v. Schissel*, 2013 WI 66, ¶30, 349 Wis. 2d 84, 833 N.W.2d 634. At issue in *Rosecky* was a custody and placement dispute between the surrogate mother, who was also the biological mother, and the biological father. *Id.*, ¶1. The parties agreed that the surrogate mother would have neither a legal relationship with nor custody and placement of the child, signing a surrogacy agreement after the surrogate mother became pregnant. *Id.*, ¶8. Near the end of her pregnancy, the

¶79     For example, the court was not asked: *when* Charlie's right to pursue a claim for informed consent arises, majority op., ¶¶2, 38, 54; *who* must give informed consent on Charlie's behalf, *id.*, ¶¶29–33, 44; *whether* any statutory exceptions exempt Charlie's physician from providing information to Charlie, *id.*, ¶¶26–28; *whether* the birthing mother needed to be part of this action, *id.*, ¶¶34–39; nor *whose rights*—the birthing mother's or child's—supersede, *id.*, ¶45. These, and other issues raised before the circuit court, are important questions that are not before us. *Md. Arms Ltd. P'ship v. Connell,* 2010 WI 64, ¶48, 326 Wis. 2d 300, 786 N.W.2d 15 (declaring that the "court should decide cases on the narrowest possible grounds").

---

surrogate mother repudiated the surrogacy agreement and refused to surrender her parental rights. *Id.*, ¶12. The circuit court held that the surrogacy agreement was unenforceable and awarded secondary placement of the child to the surrogate mother, based on testimony regarding the child's best interests. *Id.*, ¶¶15, 24.

Observing that there were no specific statutes governing the enforceability of surrogacy agreements in Wisconsin, this court looked to traditional principles of contract law. *Id.*, ¶¶47, 56. Wisconsin courts safeguard freedom of contract because "individuals should have the power to govern their own affairs without governmental interference." *Id.*, ¶56 (quoting *Merten v. Nathan*, 108 Wis. 2d 205, 211, 321 N.W.2d 173 (1982)). Surrogacy agreements represent an offer by the surrogate mother to carry the child, acceptance of this offer by the child's legal parents, and consideration in the form of a fee provided by the legal parents to the surrogate mother for her services, which collectively indicate that surrogacy agreements are contracts. *Id.*, ¶59. Emphasizing the "unique nature" of these contracts, this court held that they are enforceable, pointing to their role in "promot[ing] stability and permanence in family relationships" by, inter alia, "reduc[ing] contentious litigation that could drag on for the first several years of the child's life." *Id.*, ¶¶60–61. The circumstances in which a surrogacy agreement will not be enforced are when a traditional contract defense applies or when "enforcement is contrary to the best interests of [the child]." *Id.*, ¶¶68–69. The circuit court in *Rosecky* therefore erred in awarding secondary placement of the child to the surrogate mother without considering the surrogacy agreement. *Id.*, ¶70.

¶80    Interestingly, the majority charges forward to answer several other legal issues. In so doing, it does not mention, let alone analyze, the contract between the parties: the agreement that forms the basis of the surrogacy relationship between Samantha and Charlie's parents.[2] In other words, Charlie would not have been conceived, absent the surrogacy arrangement between the parents and Samantha. And, that surrogacy agreement gave Samantha sweeping discretion when it came to health care decisions.[3] I do not pass judgment on how the surrogacy agreement might impact this case, but the majority's analysis seems to assume that it has no relevance. Our duty was to answer the certified question, but as the majority has weighed in on a number of issues outside of that domain, it is peculiar that it makes such broad declarations without consideration of the fact that this child was produced as a result of this contract.

¶81    And the majority's overreach is curious. It makes broad declarations as if other issues were before the court. Unnecessary to the question before us is the majority's conclusion:

> [T]he fact that an unborn child is a patient under [WIS. STAT.] § 448.30 cannot override a pregnant patient's right to her own bodily integrity and autonomy. Indeed, a physician simply cannot treat a pregnant patient who withholds her consent to do so, no matter the effect on the child, barring an applicable exception. To state the obvious, any medical

---

[2] No one contends that the surrogacy agreement is unenforceable.

[3] For example, the Parentage Agreement (another name for a surrogacy agreement) entered into by Charlie's parents and Samantha, stated in Paragraph L ("therapeutic abortion or selection reduction") that Samantha had the "final decision . . . in consultation with her physician" on whether to undergo an abortion or a selective reduction, with the only remaining role for Charlie's parents being that they had to be "consult[ed]" before either procedure occurred.

Paragraph N ("parentage, legal custody and physical placement") further explained that Samantha would "consult [Charlie's] parents, to the extent time and circumstances permit, with respect to [Charlie's] medical care prior to, and immediately following birth" and instructed Samantha to "execute a power of attorney" to "delegate[e] the power to make decisions and care for [Charlie] from birth until Parentage is established."

> treatment or procedure for an unborn child necessarily affects the pregnant patient. *This is why the pregnant patient is always responsible for making medical decisions for an unborn child (*unless one of the statutory exceptions applies). And nothing in § 448.30 relates to or limits the basis upon which she may make her decision. Once a physician provides the necessary information as it relates to both patients, the physician has discharged their duty under § 448.30 and cannot be held liable under a theory of informed consent for a pregnant patient's ultimate decision.

Majority op., ¶45 (emphasis added) (footnote omitted). The majority similarly states, "Samantha was the decisionmaker for Charlie." *Id.*, ¶44. The majority does not analyze the agreement in reaching these conclusions; it instead reaches its conclusions seemingly without consideration that this is a surrogacy.[4]

¶82 The majority goes far beyond the question before us to also determine that, "As Charlie was born alive, her informed consent claim

---

[4] This is not the first time the majority has overreached. *See State v. McAdory*, 2025 WI 30, ¶¶38–39, 417 Wis. 2d 194, 22 N.W.3d 844 (Ziegler, J., concurring in the judgment) (explaining that "[t]he argument the majority ultimately embraces in this case . . . is not advanced by either party" and that "virtually every justice in the majority has voted to overrule a decision of this court even though no party asked the court to do so"). By contrast, the majority also has a habit of dodging the merits of issues squarely presented before the court. *See, e.g., Trump v. Biden*, 2020 WI 91, ¶111, 394 Wis. 2d 629, 951 N.W.2d 568 (Ziegler, J., dissenting) ("[T]he majority relies on what only can be viewed as a result-oriented application of the equitable doctrine of laches to avoid declaring what the law is."); *Wis. Voter All. v. Secord*, 2025 WI 2, ¶60, 414 Wis. 2d 348, 15 N.W.3d 872 (Rebecca Grassl Bradley, J., dissenting) ("Although both parties urged the court to resolve the substantive issue, the majority dodges it and chooses to scold the court of appeals instead."); *Hubbard v. Neuman*, 2025 WI 15, ¶35, 416 Wis. 2d 170, 20 N.W.3d 720 (Ziegler, J., dissenting) ("The court's opinion has the tail wagging the dog. The court concludes that [the plaintiff's] complaint alleges sufficient facts to ward off a motion to dismiss without ever exploring what the substantive law . . . requires for her claim to be successful."). The approach the majority takes unfortunately seems to depend on whether the overreached issues accord with its policy preferences.

attaches to Charlie herself, and the claim is not derivative." *Id.*, ¶38. The majority inexplicably expounds, "Importantly, our holding does not introduce or expand rights afforded to an unborn child. Rather, just as in any claim for negligence concerning an unborn child, it protects the right of a born child to recover for wrongs done before she was born." *Id.*, ¶46. What is the purpose of making these broad proclamations, which are beyond the certified question?

¶83 Unfortunately, Charlie suffered a severe brachial plexus injury, which has left her permanently disabled. But we are called upon to answer one question. The majority's determinations, however, go far beyond the certified question. And, the majority does not think it important to consider the surrogacy agreement or hear the parties' arguments on that issue. Instead, the majority advances to decide a host of other issues. It is the circuit court, rather than our court, that should be fully considering the parties' arguments. The majority should cabin its answer to the sole question certified by the court of appeals and not decide issues without full consideration of all the facts and arguments, including the contract.

¶84 As a result, I respectfully concur in part, and dissent in part.

REBECCA GRASSL BRADLEY, J., concurring in part and dissenting in part.

¶85 This is not an abortion case, but the majority makes it into one. The court of appeals certified a single question for this court to answer: "Whether an unborn child (or any minor child) is a patient under WIS. STAT. § 448.30 and thus entitled to informed consent with the independent right to pursue legal action against a physician who fails to comply with said statute." The answer is "yes," but the majority inexplicably restricts its holding to Charlie, recognizes her informed consent claim only because she was "born alive," and strips unborn children of their legal rights under informed consent law. The law does not discriminate against the unborn, and the majority has no constitutional authority to rewrite the law to conform to its policy preferences.

I

¶86 The majority first limits its holding by saying Charlie's right to bring an informed consent claim under WIS. STAT. § 448.30 did not vest until she was born alive: "*[a]s Charlie was born alive*, we determine she had an independent right to pursue an informed consent claim." Majority op., ¶¶2, 54 (emphasis added). The text of § 448.30 nowhere limits the informed consent claims of the unborn to children "born alive;" the parties did not brief or argue that Charlie's rights were conditioned on being "born alive;" and the majority cites no law supporting its conclusion that Charlie's rights did not vest until she was "born alive." *See id.*

¶87 Likening Charlie's informed consent claim to a claim for fetal injury, the majority cites *State ex rel. Angela M.W. v. Kruzicki*, 209 Wis. 2d 112, 130–31, 561 N.W.2d 729 (1997), for the proposition that a claim for fetal injury "attaches to a child, not the child's parents, *once the child is born alive.*" Majority op., ¶38 (emphasis added). Applying *Kruzicki*, the majority reiterates its conclusion that because "Charlie was born alive, her informed consent claim attaches to Charlie herself, and the claim is not derivative." *Id. Kruzicki* is a *Roe v. Wade*[1] era opinion having nothing to do with informed consent law, and its reasoning did not survive *Roe*'s overruling in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).

---

[1] *Roe v. Wade*, 410 U.S. 113, 162 (1973).

¶88 The *Kruzicki* court opined in *dicta* that "our decisions . . . should not be read to confer full legal status upon a fetus. . . . [W]e have recognized that until born, a fetus has no cause of action for fetal injury." 209 Wis. 2d at 130. For that proposition, *Kruzicki* cites *Roe*'s discredited, and now overruled conception of the unborn child as representing "at most" "only the potentiality of life." *Id.* (citing *Roe v. Wade*, 410 U.S. 113, 162 (1973)). *Dobbs* described the *Roe* court's pontifications on the meaning of life and the status of the unborn as "resembl[ing] the work of a legislature" rather than a court. *Dobbs*, 597 U.S. at 271. Contra *Kruzicki* and *Roe*, Wisconsin law has long recognized that an "'unborn child' means a human being from the time of conception until it is born alive." WIS. STAT. § 940.04(6);[2] *see also* WIS. STAT. § 48.02(19) ("'Unborn child' means a human being from the time of fertilization to the time of birth.").[3] Nothing in WIS. STAT. § 448.30 withholds from an unborn child the right to informed consent, and nothing in that statute requires an unborn child to be "born alive" for her informed consent rights to vest and become actionable.

¶89 This court has recognized an unborn child is an independent person, not an appendage of a "pregnant patient's"[4] (aka woman's) body.

---

[2] The *Roe* court claimed, without citation, that "the unborn have never been recognized in the law as persons in the whole sense." *Roe*, 410 U.S. at 162. Wisconsin's abortion law, enacted in 1955, belies that unfounded assertion.

[3] The majority claims the Wisconsin Statutes' definitions of "unborn child" to mean a human being from the time of conception apply strictly to the statutes in which the definitions appear. Majority op., ¶38 n.16. We read the Wisconsin Statutes in harmony. *Eau Claire Cnty. Dep't Hum. Servs. v. S.E.*, 2021 WI 56, ¶30, 397 Wis. 2d 462, 960 N.W.2d 391, 402 (citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 180 (2012)) (citations omitted). The majority itself applies the harmonious reading canon of interpretation to define "patient" in WIS. STAT. § 448.30. *See* Majority op., ¶21. The majority cannot have it both ways. It defies logic, the law, and biological reality to suggest an unborn child is a human being only in certain contexts.

[4] See the majority opinion and Justice Susan Crawford's concurrence for the biologically impossible insinuation that people other than women, that is, "pregnant patients," can become pregnant.

*See Puhl v. Milwaukee Auto. Ins. Co.*, 8 Wis. 2d 343, 356, 99 N.W.2d 163 (1959*), overruled on other grounds by*, *In re Estate of Stromsted*, 99 Wis. 2d 136, 299 N.W.2d 226 (1980) ("[T]he fetus from conception lives within its mother rather than as a part of her."). In *Puhl*, this court acknowledged the personhood of unborn children, but only as a "biological" reality. *Id.* Although the court admitted it need not philosophize about the *legal* status of the unborn to decide the case, it nevertheless determined that "the importance of this problem" compelled it to do so. *Id*. at 354. The *Puhl* court found "much to commend the biological theory of recovery" conditioned on the unborn child's birth—not based on the law, but "on moral grounds." *Id*. at 357. Like *Roe,* the *Puhl* court posited "an unborn infant is not treated as a legal person but as a separate entity or human being in the biological sense from conception having a *potentiality* of personality which is not realized until birth." *Id.* at 356 (emphasis added); *see also Roe*, 410 U.S. at 162 (unborn children "represent[] only the *potentiality* of life." (emphasis added)). Judicial reasoning based solely on a flimsy philosophical premise should be rejected out of hand.

¶90    This court later rejected *Puhl*'s musings that unborn children are merely "potential" people who lack a cause of action for fetal injury until born alive. *See Kwaterski v. State Farm Mut. Auto. Ins. Co.*, 34 Wis. 2d 14, 22, 148 N.W.2d 107 (1967) ("[A] viable infant who receives an injury and by reason thereof is stillborn is a "person" within the meaning of sec. 331.03, Stats. 1963 (now sec. 895.03, Stats.), so as to give rise to a wrongful-death action by the parents of the stillborn infant."); *see also Shannon E.T. v. Alicia M. V.M.*, 2007 WI 29, ¶34, 299 Wis. 2d 601, 615, 728 N.W.2d 636. Wrongful death actions are derivative claims brought by surviving family, predicated on the decedent's right of action existing at the time of death. WIS. STAT. § 895.03. [5] If the decedent does not have a

---

[5] WISCONSIN STAT. § 895.03 provides in full:

**Recovery for death by wrongful act.** Whenever the death of a person shall be caused by a wrongful act, neglect or default and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who would have been liable, if death had not ensued, shall be liable to an action for damages notwithstanding the death

viable cause of action at the time of death, then his survivors may not bring a wrongful death claim. *Christ v. Exxon Mobil Corp.*, 2015 WI 58, ¶23, 362 Wis. 2d 668, 866 N.W.2d 602 ("[F]or a wrongful death claim to exist, the decedent must have had a valid claim for damages against the defendant at the time of his death.") (citing *Miller v. Luther*, 170 Wis. 2d 429, 439–40, 489 N.W.2d 651 (Ct. App. 1992)). "If the decedent would have been barred from making a claim, the decedent's statutory beneficiary also would be barred." *Id.* If an unborn child dies before birth, the majority would preserve the parents' wrongful death claim while refusing to recognize the existence of the unborn child's independent cause of action. Denying the unborn child's informed consent claim unless she is born alive would, however, eliminate the parents' wrongful death claim by operation of statutory law.

¶91    Justice Susan Crawford doubles down on the majority's errors, betraying a startling ignorance of the law. Justice Crawford says, "[i]f the child is not born alive, the parents [still] have a cause of action for wrongful death." Justice Crawford's Concurrence, ¶74 (citing *Kwaterski*, 34 Wis. 2d 14, 20).  If, as the majority suggests, unborn children have no cause of action for a breach of WIS. STAT. § 448.30 before live birth, parents of unborn children who die due to a breach of § 448.30 cannot bring an action for wrongful death.[6] This is not what the law says, and the members of this court have no constitutional authority to rewrite the statutes to their liking.

¶92    Since at least 1898, this court has recognized that a person's negligence claim survives the death of the injured person, and the

---

of the person injured; provided, that such action shall be brought for a death caused in this state.

[6] Wrongful death actions compensate survivors for the injuries they suffer as a result of the decedent's death, such as "damages for postdeath loss of society and companionship." *Bartholomew v. Wis. Patients Comp. Fund & Compcare Health Servs. Ins. Corp.*, 2006 WI 91, ¶52, 293 Wis. 2d 38, 717 N.W.2d 216.

personal representative of the deceased person's estate may maintain the action for the benefit of the deceased person's surviving family. *Brown v. Chicago & Nw. Ry. Co.*, 102 Wis. 137, 139, 77 N.W. 748 (1898). The court of appeals reiterated this longstanding law nearly 100 years later, distinguishing the decedent's claim from the wrongful death claim the decedent's survivors could bring in their own right: "A wrongful death action should not be confused with an action brought on behalf of the decedent for the decedent's damages. By statute, a decedent's personal injury action survives his death. Such an action is vested with a decedent's personal representative and brought for the benefit of the decedent's estate." *Miller*, 170 Wis. 2d at 436 (first citing *Brown*, 102 Wis. at 140–42; and then citing WIS. STAT. § 895.01[7]). The *Miller* court also explained that "a wrongful death action cannot be brought unless the decedent, at the time of his death, was entitled to maintain an action and recover damages." *Id.* at 441. If, as the majority maintains, an unborn child's claim does not survive unless the child is born alive, then the parents cannot bring a wrongful death action: "The requirement that the decedent have a cause of action for damages if death had not ensued is a condition that must exist in order for a beneficiary to bring a wrongful death action." *Id.* at 437 (citation omitted).

¶93    Because Justice Crawford and the other members of the majority deny the personhood of the unborn child, they would extinguish the child's claim if the child dies before birth. Justice Crawford and the other members of the majority are wrong on the law, but perhaps they will simply decree these statutes a nullity too. *See generally Kaul v. Urmanski*, 2025 WI 32, 417 Wis. 2d 257, 22 N.W.2d 740 (erasing WIS. STAT. § 940.04(1), Wisconsin's duly enacted ban on abortion, because the

---

[7] WISCONSIN STAT. § 895.01(am) provides, in pertinent part: "In addition to the causes of action that survive at common law, all of the following also survive:

. . .

**7.** Causes of action for a violation of s. 968.31(2m) or other damage to the person."

majority said so). Manipulating the law to deny the personhood of the unborn would wipe out causes of action statutorily recognized for more than a century.

¶94    Intentionally or not, the majority creates perverse incentives. A physician who fails to obtain informed consent faces liability only if the child lives, but escapes liability under informed consent law if the child dies. *Kwaterski*, 34 Wis. 2d 14, 20. The constitutional authority to make the moral judgments underlying such line drawing may reside with the legislature, but it certainly does not rest with this court.

II

¶95    The majority also needlessly equivocates as to when Charlie became a "patient" under WIS. STAT. § 448.30, and when her rights first accrued under that statute. Section 448.30 applies to an unborn child as soon as a physician treats the unborn child. Section 448.30 does not limit an unborn child's right based on the child's viability or any other consideration, provided the unborn child is a "patient" receiving treatment.

¶96    The majority correctly says WIS. STAT. § 448.30 applies to "patient[s]," who "receive[] health care services from a health care provider." Majority op., ¶21. "As Dr. Batley was providing medical care for Charlie prior to her birth, she was his patient." *Id.*, ¶24; *see also id.*, ¶33. The majority should have stopped there. In a footnote, the majority nevertheless declares its holding is "consistent with *Vandervelden v. Victoria*, 177 Wis. 2d 243, 502 N.W.2d 276 (Ct. App. 1993)." Majority op., ¶25 n.11. *Vandervelden*'s premises rest on the overruled *Roe* decision.

¶97    In *Vandervelden*, Joshua brought claims for injuries he sustained before birth during an unsuccessful abortion. 177 Wis. 2d at 247. The court of appeals determined Joshua could not bring a battery claim against the abortionist because Joshua's mother consented to the abortion. *Id.* at 249–50. The court of appeals rejected the circuit court's rationale for allowing Joshua's claim to proceed, which was based on the fact that the fetus did not consent to be aborted. *Id.* at 251. The court of appeals reasoned, "[w]e know of no court that has found a fetus of less than three months' gestational age to be considered as a person entitled to legal protection," and that such a finding would "run[] counter to the United States Supreme Court's ruling in *Roe v. Wade*." *Id.* at 252.

¶98 In this case, the majority proclaims "[w]e take zero issue with *Vandervelden*'s conclusion that there is no basis in law to support the idea that an unborn child themself [sic] can give or withhold consent." Majority op., ¶25 n.11. *Roe* has been overturned, and the majority is powerless to resurrect it or any opinion resting on its rejected reasoning. *See generally Dobbs*, 597 U.S. 215. The majority does not explain why it felt compelled to reaffirm the court of appeals' *Roe*-based notions regarding fetal rights. *See* Majority op., ¶25, n.11. *Vandervelden* has no bearing on the disposition of the case before us and cannot restrict the informed consent rights of the unborn based on their viability.

III

¶99 In a similar vein, the majority makes a series of policy statements with a veneer of judicial authority but without any legal basis—and at times in direct contradiction of the law. The majority declares: "[T]he fact that an unborn child is a patient under § 448.30 cannot override a pregnant patient's right to her own bodily integrity and autonomy." Majority op., ¶45. Contrary to the majority's musings, ch. 48 of the Wisconsin Statutes expressly permit a court to have a pregnant woman taken into custody and to order her to receive treatment if her use of alcohol or controlled substances threatens the health of her unborn child. WIS. STAT. § 48.193. Under ch. 48, sometimes the right of the unborn child to receive medical treatment as a patient supersedes the "pregnant patient's right to her own bodily integrity and autonomy." In interpreting ch. 48, "the best interests of the child or unborn child shall always be of paramount consideration." WIS. STAT. § 48.01(1).

¶100 The majority also announces, "the pregnant patient is always responsible for making medical decisions for an unborn child (unless one of the statutory exceptions applies)." Majority op., ¶45. Which statutory exception? The majority doesn't say. Nor does the majority offer any legal authority for erasing a father's right to make medical decisions on behalf of his unborn child.

¶101 The majority's nonjudicial policy proclamations have no connection to the question before us and are irrelevant to the disposition of this case. The majority says it "may resolve all issues raised" and "[i]ndeed, it is our responsibility to address all relevant arguments made

by the parties on appeal." Majority op., ¶14 n.10. No party raised or briefed these phantom issues. The majority has no authority to decree its political preferences. Under the Wisconsin Constitution, the People of Wisconsin reserved their right to make policy decisions through their elected representatives in the legislature.

\* \* \*

¶102    WISCONSIN STAT. § 448.30 is a straightforward statute, which imposes a duty on physicians to obtain the informed consent of "patients," including unborn children. The rights and duties provided under § 448.30 accrue as soon as a physician treats an unborn child, regardless of gestational age. While informed consent law may trigger cognitive dissonance for the majority because of its policy preferences on the political issue of abortion,[8] the law is what the statute says and not what the majority may wish it to be.

---

[8] See *Kaul v. Urmanski*, 2025 WI 32, ¶¶72–105, 417 Wis. 2d 257, 303 N.W.3d 740 (Rebecca Grassl Bradley, J., dissenting).